UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. No. 1:25-10272-LTS-JGD |
| ) | |
| KSENIIA PETROVA, ) | |
| ) | |
| Defendant ) | |

## GOVERNMENT'S OPPOSITION TO
## DEFENDANTS' MOTION TO COMPEL DISCOVERY

The government respectfully submits this opposition to defendant Kseniia Petrova's motion to compel discovery (Dkt. 45) ("Motion").

The Motion speculates that the government initiated this criminal case based on Petrova's challenges to her visa cancellation and immigration detention. But the Motion never cites—let alone applies—the applicable First Circuit standard for obtaining discovery in support of a vindictive or selective prosecution claim. It does not even correctly identify the date Petrova was charged. None of the Motion's claims of retaliation amounts to the "objective evidence" that a defendant must show to warrant discovery. A defendant must do more than simply "identify a potential motive for prosecutorial animus." *United States v. Bucci*, 582 F.3d 108, 114 (1st Cir. 2009) (quoting *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000)). Petrova does not and cannot do so here. For the reasons set forth herein, the Motion should be denied.

## I. Background

Petrova worked as a research assistant at a Boston-area medical school under a J-1 visa. On February 16, 2025, she arrived at Logan International Airport ("Logan") via an inbound flight from Paris. Dkt. 19 (Indictment) ¶¶ 1-2.

At the Passport Control booth, a U.S. Customs and Border Protection ("CBP") officer asked Petrova, "Where are you coming from?" Petrova replied, "France." When the CBP officer asked, "Any other countries?" Petrova falsely responded "no," despite having traveled to several other countries that trip. Asked if she had any food, Petrova falsely responded "no." Petrova declared no items during this primary inspection.[1] Motion, Ex. D (Prelim. Hr'g Tr.) at 12-14.

Thereafter, a CBP canine alerted his handler, a CBP Agriculture Specialist, to Petrova's checked luggage on the baggage carousel. The Agriculture Specialist removed the bag to an agricultural secondary inspection area, where he inspected the contents and discovered frog embryo samples, as well as fruit and meat. Dkt. 2-2 (Compl. Aff.) ¶ 7; Prelim. Hr'g Tr. at 14-16.

The Agriculture Specialist called Petrova's name on the loudspeaker and, upon receiving no response, located Petrova by photograph in the baggage carousel area. The Agriculture Specialist asked Petrova whether she was traveling with any biological materials, and Petrova stated no. When the Agriculture Specialist asked her again, Petrova presented a plastic bag that she was carrying, which contained a foam box with frog embryos in microcentrifuges, as well as embryo slides. Compl. Aff. ¶ 8; Prelim. Hr'g Tr. at 16-17.

A review of Petrova's phone revealed text messages with co-workers about getting through Customs with the frog embryos. For example, Petrova texted her principal investigator that she had the samples "on ice." Her principal investigator asked, "What is your plan to pass the American Customs with samples? This is the most delicate place of the trajectory." After he again asked, "What is your plan for getting through customs with samples?" Petrova replied, "No plan yet. I won't be able to swallow them." Compl. Aff. ¶¶ 8-10; Prelim. Hr'g Tr. at 26-32.

---

[1] Under 19 C.F.R. Part 148.11, "[a]ll articles brought into the United States by any individual must be declared to a CBP officer at the port of first arrival in the United States[.]"

On May 2, 2025, Homeland Security Investigations ("HSI") opened a criminal investigation upon a referral from HSI headquarters. Prelim. Hr'g Tr. at 37:07-38:12. On May 12, 2025, this Court issued a criminal Complaint charging Petrova with smuggling goods into the United States, in violation of 18 U.S.C. § 545. Dkt. 2. At Petrova's initial appearance in the district on June 12, 2025, the government agreed to conditions of release. Dkt. 14. On June 25, 2026, the grand jury returned an Indictment charging Petrova with one count of concealment of material fact (for not declaring the frog samples to CBP), in violation of 18 U.S.C. § 1001(a)(1); one count of false statement (for denying that she had biological material in her possession), in violation of 18 U.S.C. § 1001(a)(2); and one count of smuggling goods into the United States (for fraudulently and knowingly bringing the frog embryo samples into the United States without declaring them), in violation of 18 U.S.C. § 545. Dkt. 19.

In addition to seeking general discovery for a vindictive or selective prosecution claim, the Motion addresses specific discovery requests that Petrova made by letter (Motion, Ex. A) and the government's response to those requests (Motion, Ex. B).

This is not the "unprecedented prosecution" that the Motion claims. CBP is responsible for protecting against biothreats. Its agriculture specialists can only make determinations about whether items can or cannot enter the country (based on potential harmfulness or other grounds) if they are aware of the items in the first place and can identify what the items are. The government has an obvious and unremarkable interest in deterring travelers from deliberately concealing items and lying to CBP, regardless of whether the items are dangerous or harmless. *See*, *e.g.*, *United States v. Chengxuan Han*, No. 2:25-cr-20479-MFL-DRG (E.D. Mich.) (researcher at University of Michigan charged with smuggling and false statement for sending packages containing concealed research samples related to round worms into the United States and lying during a

subsequent CBP inspection); *United States v. Yunqing Jian*, No. 2:25-c0701-SKD-KGA (E.D. Mich.) (University of Michigan researcher charged with smuggling and false statements for flying into Detroit airport with concealed fungi that causes "head blight" on crops).

## II.  The Motion Presents No Objective Evidence of Prosecutorial Vindictiveness

The Motion fails to make the required showing for discovery in furtherance of a vindictive prosecution claim.

A prosecution violates the Fifth Amendment right to due process when "the prosecutor seeks to punish the defendant for exercising a protected statutory or constitutional right." *United States v. Jenkins*, 537 F.3d 1, 3 (1st Cir. 2008) (citing *United States v. Goodwin*, 457 U.S. 368, 372 (1982)).  A presumption of vindictiveness may arise where evidence demonstrates that a "reasonable likelihood of vindictiveness exists."  *Goodwin*, 457 U.S. at 373.  However, "[i]t is difficult to make such a showing pretrial … in light of the broad discretion afforded the prosecutor to determine who should be prosecuted and for what crime, and the presumption that the prosecutor has exercised that discretion in good faith." *Bucci*, 582 F.3d at 112.[2]

---

[2] The court in *Bucci* explained: "In contrast to a pretrial claim of vindictive prosecution[,] the Supreme Court has recognized that the Government's decision to increase the charges brought against a defendant after he has once been convicted may more readily create a presumption of vindictiveness[.]"  *Id.* at 113 n.3 (citing *Goodwin*, 457 U.S. at 381 ("[O]nce a trial begins—and certainly by the time a conviction has been obtained—it is much more likely that the [Government] has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted. Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.").  *See also United States v. Cooper*, 461 F.3d 850, 856 (7th Cir. 2006) (explaining that a "presumption of vindictiveness does not apply to pretrial decisions by the prosecution because '[a] prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution'" (quoting *Goodwin*, 457 U.S. at 382)).

"In light of the presumption that a prosecutor has acted in good faith in exercising his discretion to make charging decisions, courts require a defendant seeking discovery first to come forth with 'some' objective evidence tending to show the existence of prosecutorial vindictiveness." *Id.* at 113 (citations omitted).[3]  To obtain such discovery, a defendant "must do more than simply 'identify a potential motive for prosecutorial animus.'"  *Id.* at 114 (citation omitted).  *See also Sanders,* 211 F.3d at 718 ("To warrant discovery, the defendant must show some evidence of genuine animus, not the mere possibility that animus might exist under the circumstances.").  The defendant "must connect any vindictive animus to those making the challenged charging decisions in his case."  *Bucci*, 582 F.3d at 114.  Moreover, "'evidence of suspicious timing alone does not indicate prosecutorial animus.'"  *Id.*  The standard for obtaining discovery is a "rigorous" one because

> examining the basis of prosecution delays criminal proceedings, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.

*Sanders,* 211 F.3d at 717 (citing *United States v. Armstrong,* 517 U.S. 456, 465, 468, (1996)).

The Motion offers no direct evidence of prosecutorial animus.  Rather, it contends that the "totality of events creates a sufficient evidentiary basis to conclude that there is a 'realistic likelihood of vindictiveness' [and selectivity] that entitles [Ms. Petrova] to discovery."  Motion at 11 (quoting inapplicable standard).  But the circumstances that the Motion puts forth neither individually nor cumulatively present "objective evidence" of vindictiveness.

*Timing*

The timing of the criminal case is not objective evidence of retaliation.

---

[3] The Motion fails to cite or address this controlling standard from *Bucci* even once.

In *Bucci*, the First Circuit stressed that "evidence of suspicious timing alone does not indicate prosecutorial animus." *Bucci* 582 F.3d at 114. *See, e.g.*, *Espinal-Genao v. United States*, 2010 WL 3809997, at *5 (D.P.R. Sept. 28, 2010) (rejecting contention that "highly atypical chronology" was evidence of a vindictive prosecution). As in *Bucci*, "the sequence of events in this case is not so remarkable as to justify discovery." *Bucci*, 582 F.3d at 114.

First, the Motion contends that the prosecution is irregular because the government initiated it months after Petrova's violations. *See* Motion at 5 ("nearly three months after the February 16, 2025 incident at Logan Airport"). But it is far from uncommon for criminal charges to issue weeks or months after underlying conduct. Investigators require time to obtain evidence, and prosecutors need time to evaluate evidence and make charging decisions.[4]

HSI opened its case based on a criminal referral from headquarters on May 2, 2025. At the preliminary hearing, Special Agent Brian Goldsworthy testified that CBP does not always refer a case for investigation contemporaneously with the discovery of a potential smuggling violation. Prelim. Hr'g Tr. at 34:15-35:03. Asked by the defense why the referral occurred two-and-a-half months following the encounter with Petrova, Special Agent Goldsworthy testified: "I won't say that it's very unusual to get referrals in this manner." *Id.* at 38:20-23. Special Agent Goldsworthy's report on his receipt of information (Motion, Ex. C) contains no indication that HSI headquarters referred the matter based on any developments in Petrova's habeas case.

Second, the Motion suggests that the government charged Petrova in response to wins for her in the habeas case. Motion at 2 ("[A]s [Petrova] achieved incremental success in her habeas

---

[4] The Motion quotes a former customs attorney's statement that he had never seen a person who was not initially processed for a "failure to declare" later be charged with smuggling. Motion at 13. Here, though, it is not unusual that CBP personnel would not have cited Petrova for a failure to declare at the same time that they were initiating removal proceedings.

case and appeared likely to be released on bond, federal prosecutors brought the instant criminal case.").  The Motion's interpretation of the timeline breaks down here.  It takes as its benchmark a May 14 motion hearing, at which the habeas court "queried the government" and scheduled a bail hearing for May 28.  *Id.* at 5.  The Motion plays up the fact that the criminal charges were unsealed "[m]ere hours after the May 14 hearing in the habeas proceeding" (*id.*) but fails to acknowledge that the Complaint issued *two days prior, on May 12*.  Petrova's "incremental success" on May 14 did not prompt a same-day prosecution; she was already charged by that time.

Third, the Motion claims that Petrova has shown—apparently, based on mere timing—that the government initiated the criminal case to "thwart" her challenge to the immigration proceedings against her.  Motion at 12.  But a criminal case initiated at *any time* after February 16 would have trailed her assertion of a legal right; Petrova claimed asylum on February 16 (at the airport) and filed her habeas petition on February 23.  A May 12 filing of criminal charges is no more indicative of retaliation than a February 23 filing or a May 28 filing.  Moreover, the possibility that criminal charges could adversely affect other proceedings is not evidence that the criminal charges were initiated to "thwart" Petrova in those proceedings.

Speculation about the timing of charges does not amount to "objective evidence."  And, as demonstrated, a closer look at the timeline in this case does not support the retaliatory spin the Motion attempts to give it.

*Publicity*

Investigators' general awareness of media attention surrounding Petrova's immigration case is not objective evidence of retaliation.

The Motion asserts that publicity surrounding Petrova's detention prompted the government's decision to charge her.  Motion at 14.  While the Motion states that "[t]he

government has closely tracked this media attention" (Motion at 5), the May 14 (post-charge) HSI subject report merely notes that open-source findings included "various articles and podcasts" and summarizes three examples, including the opinion piece (Motion, Ex. C at 8-9).

Any statements made by Petrova about the events of February 16 are themselves potential evidence relevant to the criminal case.  Moreover, the First Circuit has recognized that the "relative efficacy of [a] prosecution as a deterrent" is a factor that "legitimately may influence the government's decision to prosecute [an] individual[.]"  *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008).  That investigators paid attention to media reports about Petrova is not "objective evidence" that the government prosecuted Petrova to punish her for attracting media attention or making statements.

*U.S. Attorney's Statement*

The U.S. Attorney's statement following the unsealing of charges against Petrova on May 14, 2025 is not objective evidence of retaliation.

The Motion contends that the statement's reference to Petrova's May 13 opinion piece "suggests that the publicity surrounding her detention and exercise of Ms. Petrova's First Amendment rights provoked, at least in part, the charging decision."  Motion at 14.  This argument fails for the already obvious reason: the criminal Complaint issued on May 12.  The government could not have charged Petrova as punishment for an opinion piece that the government did not know would run the following day.

The U.S. Attorney's statement squarely addressed Petrova's conduct at the airport: "Kseniia Petrova, a Russian national, allegedly smuggled clawed frog embryos and embryonic samples into the U.S. from overseas and then repeatedly lied to Customs and Border officials about having biological material in her baggage."  It tied her prosecution to that conduct: "Ms. Petrova's

alleged lies and disregard for the health and safety of others have resulted in her arrest today on criminal charges." https://x.com/DMAnews1/status/1922765637815849015. Petrova does not establish "objective evidence" of retaliation by speculating that a reference to her opinion piece "suggests" animus. *See Sanders,* 211 F.3d at 718 ("To warrant discovery, the defendant must show some evidence of genuine animus, not the mere possibility that animus might exist under the circumstances.").

*District of Vermont's Denial of a Motion to Dismiss*

A finding that Petrova has "plausibly alleged" retaliation in a habeas petition is not objective evidence of retaliation.

The Motion twice attempts to present the District of Vermont's denial of a motion to dismiss Petrova's habeas petition as part of the factual record. *See* Motion at 2, 10 ("She is entitled to discovery in support of those planned [selective/vindictive prosecution] motions based on the record already available, including the habeas court's finding that Ms. Petrova has plausibly alleged that 'her criminal proceedings were initiated for an improper purpose.'" (citing order)). That order has no factual significance here. As with any Rule 12(b)(1) motion, the court "accept[ed] as true all material allegations of the complaint and construe[d] the complaint in favor of the complaining party." *Petrova v. U.S. Dept. Homeland Security et al.*, No. 25-cv-00240, Dkt. 95 at 43 (D. Vt. Sept. 26, 2025) (cleaned up) (Order on DHS's Motion to Dismiss). All that the court decided was that Petrova did not fail to state a claim. It made clear, "[a]t this nascent phase of the proceedings, the court awaits the development of a factual record to adjudicate [Petrova's] novel claim." *Id.* at 43.

Whether Petrova's habeas claim survives a motion to dismiss is a far different question from whether she has met the exacting standard for discovery in furtherance of a retaliatory

prosecution claim.  An allegation, accepted as true and viewed in the light most favorable to the maker of the allegation, is not objective evidence.

*Alleged Attacks on Scientists, Universities, and Harvard*

Finally, Petrova's allegations about "a campaign by the Trump Administration against academics, scientists, universities, and Harvard in particular" (Motion at 14-15) are not objective evidence of retaliation against Petrova.

*Bucci* is clear: Petrova "must connect any vindictive animus to those making the challenged charging decisions in [her] case."  *Bucci* 582 F.3d at 114 (finding no evidence suggesting that concerns expressed by law enforcement officers about defendant's operation of a website "ever affected the prosecutors making the specific charging decisions in his case").  Her generalized allegations of an "attack campaign" are not evidence of vindictive animus either toward her personally or by the prosecutors who made the decision to charge her.

\*      \*      \*

Petrova fails to carry her burden of establishing even "some" objective evidence of prosecutorial vindictiveness that would warrant discovery.  The Motion presents no concrete evidence showing that Petrova's challenges to her visa cancellation and immigration detention affected the government's decision to seek criminal charges.  Her motion for discovery on the basis of vindictive prosecution should therefore be denied.

**III. The Motion Offers No Objective Evidence of Selective Prosecution, Either**

The Motion also claims that Petrova is entitled to discovery in support of a claim that the prosecution against her is unconstitutionally selective.  But the Motion fails to develop this argument, and controlling law forecloses it.

"The essence of [a showing of selective prosecution] is that a prosecutor has pursued a case for a constitutionally impermissible reason, such as the defendant's race, religion, or other characteristic cognizable under equal protection principles." *Lewis*, 517 F.3d at 25 (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985)). As with claims of vindictive prosecution, the First Circuit approaches an assertion of selective prosecution "mindful that federal prosecutors must be afforded substantial discretion not only in determining whether to prosecute a suspected violation of federal law but also in deciding what charges should be lodged." *Id.* (citing *Armstrong*, 517 U.S. at 464 and *Wayte*, 470 U.S. at 607).

Establishing selective prosecution "entails a binary showing: the defendant must adduce clear evidence of both the discriminatory effect of the prosecution and the prosecutor's discriminatory intent." *Id.* (citation omitted). "The evidentiary threshold that a defendant must cross in order to obtain discovery in aid of a selective prosecution claim is somewhat below 'clear evidence,' but it is nonetheless fairly high[:] To cross this lower threshold, a defendant must present 'some evidence' tending to show both discriminatory effect and discriminatory intent. *Id.* (citations omitted). Thus, the showing required to obtain discovery into a selective prosecution claim is a "rigorous standard." *See Cousin*, 2022 WL 314853, at *19.

The Motion fails to engage in *any* analysis of these controlling first principles with respect to its selective prosecution claim. It fails to identify the "constitutionally impermissible reason" for which Petrova believes the government has pursued this case against her. It neglects to address the required showing of either discriminatory effect or discriminatory intent, to offer "some evidence tending to show" either, or to even cite *Lewis*. The Motion merely asserts that Petrova "has been singled out for irregular and discriminatory treatment." Motion at 24-25.

"[E]vidence in support of the asserted discriminatory effect must comprise a credible showing that similarly situated individuals who do not share the protected characteristic were not prosecuted." *Lewis*, 517 F.3d at 25 (citation omitted). "A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced." *Id.* at 27. In evaluating whether offenders are "similarly situated, "[t]he focus of an inquiring court must be on factors that are at least arguably material to the decision as to whether or not to prosecute." *Id.* "Material prosecutorial factors" are those that "have some meaningful relationship either to the charges at issue or to the accused" and that "might be considered by a reasonable prosecutor." *Id.* (citations omitted). "A multiplicity of factors legitimately may influence the government's decision to prosecute one individual but not another[, including,] *inter alia*, the comparability of the crimes, the similarities in the manner in which the crimes were committed, the relative efficacy of each prosecution as a deterrent, and the equivalency of the evidence against each prospective defendant." *Id.* at 27. "The bottom line, then, is that a district court should assess every material fact in rendering its judgment as to which offenders should be deemed similarly situated." *Id. See also United States v. Olvis,* 97 F.3d 739, 744 (4th Cir. 1996) ("defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them").

Petrova has offered no evidence of discriminatory effect. The Motion does not articulate how Petrova purportedly falls into a protected class for purposes of this analysis. *See id.* (in the selective prosecution context, "classic equal protection principles light our path and limn the attributes of one who is similarly situated" (citing *Armstrong*, 517 U.S. at 465)). And the Motion identifies no "similarly situated individuals who do not share the protected characteristics [and

who] were not prosecuted." *Id.* at 25. Blowing past the controlling First Circuit analysis, the Motion merely posits that there is a "limitless sea of violations" of the requirement to declare all articles brought into the United States. But an individual who enters the United States with a souvenir "scorpion encased in plastic" (Motion at 5) or "Eiffel Tower magnet" (*id.* at 25) clearly is not "similarly situated" to one charged with purposely concealing and not declaring research samples in her baggage and falsely denying the samples when confronted by CBP personnel. *See*, *e.g.*, *Lewis*, 517 F.3d at 25-28 (affirming district court's determination that the "pool of offenders similarly situated to the defendant consisted of non-African Americans and/or non-Muslims who had committed multiple misrepresentation offenses in connection with firearms paperwork, who posed a danger of violence, and who may have had links to terrorism" rather than merely "those who have committed the same basic offense—no more and no less"). Other "material prosecutorial factors" further dispel the suggestion of selective prosecution, including the evidence of Petrova's pre-arrival communications about how she could get the frog embryos through customs. *See id.* at 27 ("manner in which the crimes were committed" and "equivalency of the evidence" are legitimate factors that may influence the decision to prosecute one individual but not another). The Motion's bare assertion that Petrova was "singled out" for prosecution does not come close to a showing of discriminatory effect. For that reason alone, the Motion fails to meet the requirement for further discovery into Petrova's claim. *See id.* at 25 (noting that "failure on one branch dooms the discovery motion as a whole").

But the Motion also fails to establish discriminatory intent. "[T]he evidence in support of the asserted discriminatory intent must consist of a credible showing that the government chose to prosecute at least in part because of, not merely in spite of, the defendant's protected characteristic." *Id.* (citations omitted). The Motion identifies neither a protected characteristic nor

proof that the government prosecuted Petrova because of that characteristic.  Petrova's bid for discovery regarding selective prosecution thus fails on the discriminatory intent branch as well.

### IV. Specific Defense Requests

As addressed above, Petrova has not met the required showing to merit further discovery into alleged vindictive or selective prosecution.  On that basis, the Court should deny each of the defense requests 16 through 21 and 27 through 29, which by the Motion's own admission are pursued in furtherance of a vindictive or selective prosecution claim (Motion at 20, 24-25).  The government responds to the Motion's other specific discovery requests herein.[5]

*Audio or Video Recordings*

The government has produced all known audio or video recordings of Petrova at Logan as requested (Motion at 16-17).  The government is unaware of any recording of her interaction with the CBP Agricultural Specialist, which occurred outside the secondary inspection area.

*K9 Alert and Food Products*

The government has produced all known materials responsive to these requests (Motion at 17), comprising reports that describe the canine alert to the luggage and the food products therein.

*Timing of Loudspeaker Announcement*

The government is unaware of documentation of "the precise time" at which CBP personnel called Petrova's name over the loudspeaker (Motion at 17-18).

---

[5] To narrow the issues the Court must resolve, the government is producing Petrova's A-File (Motion at 15-16) and the requested investigative reports (Motion at 16).

*Notice of Seizure*

The government previously produced a Custody Receipt for Seized Property and Evidence that accompanied the seized frog embryos sent to the FBI laboratory.  The government is not aware of any additional Notice of Seizure that issued with respect to the seized materials (Motion at 18).

*Reports and Examination*

The Motion claims that there must be more by way of reports of examinations and tests performed by Dr. Robert Bull, the biologist who examined the seized materials (Motion at 18-19). But the government is not hiding the ball with respect to Dr. Bull's examination of the frog embryos.  Investigators asked Dr. Bull to inspect and identify the specimens seized from Petrova— no more, no less.  Dr. Bull confirmed that the specimens were frog embryos and observed that they were biological materials.  The government produced a log of the items Dr. Bull received and two images of the frog embryos that Dr. Bull provided.  It is unclear what other reports, examinations, or tests the defense believes Dr. Bull performed or should have performed to support the allegation that Petrova falsely denied carrying biological materials.

To the extent the defense wishes to debate the meaning of "biological" or challenge a biologist's understanding of that word, it has all relevant information for doing so.

*Statements of Will Trim*

The government disclosed the transcript of the grand jury testimony of Will Trim (Petrova's lab co-worker and boyfriend).  As stated in the government's response to Petrova's discovery letter, while Trim and his lawyers met with members of the investigative team briefly before his grand jury testimony, his statements during that meeting were substantively the same as those he made in his grand jury testimony.  The Motion insists that Trim made additional statements not reflected in the grand jury transcript and that "the government should be required

to disclose the substance of Mr. Trim's statements in the pre-meeting, whether or not prosecutors or agents wrote reports or took contemporaneous notes." Motion at 20-22.

To the extent Trim's account of his statements to the government differs from the grand jury transcript and the government's understanding of his statements, the defense is the party with information about any alleged discrepancy (presumably through its access to Trim). The defense has not disclosed statements or information provided by Trim (except as included in the Motion). The government has disclosed its record of Trim's statements. If Trim contends that he made additional statements not memorialized by investigators, the defense is aware of that contention and can make use of it.[6]

*Legal Instructions to the Grand Jury*

The Motion speculates that the government misdirected the grand jury and thus demands the production of prosecutor instructions. But the Motion fails to establish a "particularized need" warranting disclosure of these materials, which are subject to grand jury secrecy protections.

Rule 6(e) of the Federal Rules of Criminal Procedure imposes "an absolute obligation of secrecy regarding grand jury proceedings, with some very limited exceptions." *United States v. Facteau*, No. 15-cr-10076-ADB, 2016 WL 4445741, at *4 (D. Mass. Aug. 22, 2016). Among these limited exceptions is Fed. R. Crim. P. 6(e)(3)(E)(ii), which permits the Court to authorize disclosure "at the request of a defendant who shows that a ground may exist to dismiss the

---

[6] The Motion specifically alleges that Trim made "a statement that lab members including Ms. Petrova had *not* discussed prior to her trip whether it was necessary to declare lab samples" and a statement "that lab personnel did not know (or believe) it was necessary to declare inert samples upon entry." Motion at 20. As the government noted in its discovery response letter (Motion, Ex. B at 3), Trim repeatedly testified that he had "no specific knowledge" of Petrova bringing anything back from Paris and stated: "There were no specific conversations to my memory about bringing certain items back."

indictment because of a matter that occurred before the grand jury."  Only a "compelling necessity" warrants a review of grand jury proceedings.  *United States v. Capozzi*, 486 F.3d 711, 727 (1st Cir. 2007) (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958)).  "The burden of showing particularized need rests squarely on the defendant."  *Id.* (citing *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395 (1959)).

Thus, a defendant must make a showing of a particularized need to warrant the disclosure of grand jury materials—including prosecutor instructions.  The Motion cites dicta from one order expressing the belief of one session of this Court that there is "no reason why the prosecutors' instructions to the grand jury should be kept secret."  *Facteau*, 2016 WL 4445741 at *5.  But even that order acknowledged that, on the "merits of the issue" and under "prevailing case law," the Court could not upset the Magistrate Judge's refusal to compel the disclosure of grand jury records.  *Id.*  The government is not aware of any case in which a session of this Court has disregarded the requirement of a particularized need for the transcripts of a grand jury's legal charge.  *See, e.g.*, *United States v. Luthra*, No. 15-cr-30032-MGM, 2018 WL 283892, at *3 (D. Mass. Jan. 3, 2018) (observing that the weight of First Circuit precedent holds that grand jury instructions are secret and finding that defendant's reliance on dicta in *Facteau* was unavailing based on "prevailing case law"); *United States v. Gurry*, No. 16-cr-10343-ADB, 2019 WL 247205, at *2 (D. Mass. Jan. 17, 2019) (citing session's prior view in *Facteau* but finding "no basis for requiring [grand jury legal instructions'] disclosure" where there was "a facially valid indictment" and "no showing of particularized harm"); *United States v. Diaz Fontanez*, No. 19-cr-10421-DJC, 2023 WL 5200202, at *13 (D. Mass. Aug. 14, 2023) (noting dicta from *Facteau* but declining to order production, even where defendant alleged a specific misinstruction).

17

Here, the Motion alleges no defect in the indictment or particularized harm. It merely invokes "circumstances" that are entirely unrelated to the legal instructions to the grand jury and that, in any event, are not the red flags the Motion makes them out to be.

For example, the Motion grossly misrepresents Special Agent Goldsworthy's testimony at the preliminary hearing. It twice claims that the agent was unable to define "merchandise." Motion at 7, 23. Special Agent Goldsworthy is not a lawyer. His role at the preliminary hearing was to summarize the evidence supporting probable cause for the criminal Complaint. He did so. The Court repeatedly sustained objections to cross-examination calling for a legal opinion, including as to whether Petrova's samples were merchandise within the meaning of the smuggling statute. *See*, *e.g.*, Prelim. Hr'g Tr. at 47:22-25, 61:03-06. Nonetheless, asked by the defense to agree that merchandise "connotes products bought and sold by a merchant," Special Agent Goldsworthy responded, *accurately*: "I think it could be anything." *Id.* at 48:05-09. On this record, faulting Special Agent Goldsworthy for failing to rattle off the statutory definition of "merchandise" ("goods, wares, and chattel of every description" under 19 U.S.C. § 1401(c)) is uncalled-for, especially where the defense has raised no colorable argument that Petrova's samples fall outside that broad definition, and the agent's lay understanding was more accurate than that put forward by the defense.

Likewise, Special Agent Goldsworthy did not fail to "explain any limitations on declaration requirements" (Motion at 23). The transcript demonstrates that he explained general exceptions in response to defense questions. Prelim. Hr'g Tr. at 48-49. The Motion raises no specific issue with the answers he gave and no reason to conclude from those answers that prosecutors incorrectly instructed the grand jury on the declaration requirement.

18

It also is misleading to insist that Special Agent Goldsworthy could not define "biological materials" (Motion at 23) where the criminal charges rely on no such statutory or regulatory definition. Petrova was required to declare the samples because they were "articles brought into the United States," under 19 C.F.R. § 148.11, not because they were "biological material" specifically. Despite not being a lawyer, Special Agent Goldsworthy *correctly* testified that any legal definition of "biological product" was irrelevant to the smuggling charge. Prelim. Hr'g Tr. at 45:25-46:07. In the indictment that the grand jury subsequently returned, Count Two charges Petrova with falsely denying that she had biological material in her possession when asked by the CBP Agricultural Specialist. This count also relies on no legal definition of biological material. Petrova can contend that her denial was not false, because she did not understand her research samples to be "biological" (though she did not protest that descriptor during subsequent questioning by CBP personnel at the airport). But her quarrel with that term presents no reason to examine a legal charge to the grand jury that did not instruct on that term.

Finally, the Motion complains that prosecutors prevented Trim from providing "clarifying testimony" (Motion at 23) which, it claims, "would have conveyed exculpatory information to the grand jury" (*id.* at 20). A grand jury witness is not entitled to give open-ended testimony, and Trim's "awareness of applicable regulations" (*id.* at 21) is not exculpatory as to Petrova's conduct. But even if it were, the law is clear: "[I]t is permissible for the government to use the investigatory powers of the grand jury to present evidence favorable to the government's case, and the government is under no duty to elicit exculpatory testimony while doing so." *United States v. Sampson*, 820 F. Supp. 2d 202, 237 (D. Mass. 2011) (citing *United States v. Williams*, 504 U.S. 36, 51–54 (1992)).

The Motion shows no particularized need for the legal instructions to the grand jury, so its request must be denied.

*Signage at Airport*

In response to the defense's discovery requests (Motion at 23-24), the government has obtained and is producing photographs of signage at the gate and in the customs area, including a sign notifying travelers that "U.S. residents must declare all articles (to include gifts) acquired abroad" and that "[s]muggling is a serious criminal offense that may result in both civil and/or criminal sanctions." The government will produce the video recording that plays on television screens upon receipt from CBP.

The government is not aware of airport signage or hand-distributed guidance specifically concerning biological materials. The government's response letter directed the defendant to CBP's public guidance concerning the importation of biological materials into the United States (*see*, *e.g.*, https://www.cbp.gov/border-security/protecting-agriculture/importing-biological-materials-united-states).

## <u>CONCLUSION</u>

Petrova has shown no objective evidence meriting discovery in support of a vindictive or selective prosecution claim, and no basis for her other discovery requests. Her Motion should be denied.

Respectfully submitted,

LEAH B. FOLEY
UNITED STATES ATTORNEY

By:    */s/ David M. Holcomb*
       DAVID M. HOLCOMB
       Assistant United States Attorney

Date: January 19, 2026

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document was filed through the ECF system on January 19, 2026 and will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

By:     <u>*/s/ David M. Holcomb*      </u>
David M. Holcomb
Assistant United States Attorney