UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:25-cr-10272-LTS |
| v. | ) | |
| | ) | |
| KSENIIA PETROVA, | ) | |
| | ) | |
| Defendant. | ) | |

BEFORE THE HONORABLE JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE

Motion hearing
(Digital recording)

February 10, 2026
10:03 a.m. - 11:30 a.m.

John Joseph Moakley United States Courthouse
1 Courthouse Way
Boston, Massachusetts 02210

Proceedings recorded by sound recording and produced by computer-aided stenography.

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
DAVID M. HOLCOMB, ESQ.
United States Attorney's Office
1 Courthouse Way
Suite 9200
Boston, Massachusetts 02210
(617)748-3354
David.holcomb@usdoj.gov

ON BEHALF OF THE DEFENDANT:
WILLIAM W. FICK
Fick & Marx LLP
24 Federal Street
4th Floor
Boston, Massachusetts 02110
(857)321-8360
Wfick@fickmarx.com

Proceedings recorded by sound recording and produced by computer-aided stenography.

P R O C E E D I N G S

(Recording begins 10:03:06 a.m.)

THE CLERK: The United States District Court for the District of Massachusetts is now in session on February 10th, the year 2026, in the matter of the United States of America versus Kseniia Petrova, Criminal Case Number 202510272.

Could counsel please identify themselves for the record?

MR. HOLCOMB: Good morning, Your Honor. David Holcomb for the United States.

MR. FICK: Good morning, Your Honor. William Fick for Ms. Petrova who is here with me.

THE COURT: Good morning.

We're here on the defendant's motion to compel.

MR. FICK: That's right, Your Honor.

THE COURT: Have you made any changes since the papers were filed?

MR. FICK: Well, I mean, as the papers reflect, after the motion was filed, the government did produce some materials, and so some of the requests -- and I can talk about which ones -- the government has represented that they produced everything they're aware of, you know.

I -- my only concern with that language is I would expect that awareness involved some level of inquiry to find

out, right, whether something exists, sort of, outside the four corners of this U.S. Attorney's Office, and, you know, if that's the case, then those requests, where the government has produced things and said it's unaware of anything else, are probably satisfied, but it leaves other categories that are still in dispute.

THE COURT: We'll go over all of it, but, obviously, you could have called.

MR. FICK: I'm sorry?

THE COURT: You could have called them to find out how -- if you have an issue as to --

MR. FICK: Well --

THE COURT: -- the words that he's using, but we'll --

MR. FICK: Well --

THE COURT: -- we'll go over it.

MR. FICK: Okay. I mean, that was really -- a reflection really. I mean, I read the papers again this morning, and that sort of jumped out at me that that was the language.

But, in any event, yes, that's something that we can clear up, and those -- the categories where they produced things and said we're unaware of anything else are probably not controversial.

THE COURT: Okay.

MR. FICK: But it does leave some area of substantial

controversy.

And I guess I'll start with the biggest one, and that is the question about the showing required to get discovery on issues of either vindictive prosecution or selective prosecution.

And I don't think there's any disagreement about the legal standard here, right. The standard is if the defense produces some objective evidence of vindictiveness, that warrants discovery, you know.

The government cites the *Bucci* case out of the First Circuit, which, you know, sets off that standard. It comes from Armstrong, a Supreme Court case, and the cases that we cite in our brief, which are more recent and a little bit of a different context, also all come from *Armstrong*, so we're not really disputing the standard.

I'd suggest *Bucci* is not really a very good touchstone of comparison for a couple of reasons. It's a case from a very different time about a very, very different kind of criminal investigation, right.

The *Bucci* case that the government relies on was a big drug investigation, serious drug charges get filed against Mr. Bucci. He creates this Whosarat.com website, which is controversial.

Six months later the government supersedes with some more serious charges, and a year later they supersede again

with yet more serious charges. And that -- you know, the defense argued there that, well, the government's just retaliating against him because of rat.com.

But the temporal proximity there is -- it's along a much greater horizon, right. We're talking about six months and a year after that. And it also just looks much more like what always happens or what often happens in an ordinary drug investigation; initial charges are brought; investigation continues; the charges get enhanced. That doesn't look, on its face, terribly unusual.

And so, you know, the First Circuit said, well, you know, suspicious timing isn't enough, which I don't disagree with that, but I would suggest the timing in *Bucci* was not very suspicious to begin with, and, of course, it doesn't mean that timing is not a factor.

I mean, all the Courts that have looked at this where there is an issue of suspicious timing and say it is a factor to be considered. So I don't think *Bucci*, on its facts, really helps us or even teaches us much about the law, you know.

The Court -- there are lots of cases we cite in our papers. I think the most interesting one that comes out of, sort of, our time and circumstances is the *Abrego Garcia* case out of the Middle District of Tennessee where you had, you know, a similar situation about disputed conduct by homeland security, judicial intervention or judicial action that seemed

to result in, sort of, traction for the claimant, the defendant in that case, and then the sudden institution of criminal charges that appear both in timing and in, sort of, structure to be intended to thwart that effort, right.

And the Court found there that there was grounds for additional discovery, and the case is cited in the papers. It is -- it's a Lexis cite, but the Court will find it in the papers.

And so, you know, that comes from the current world we're living in where the -- sort of, the interactions between the White House, the Department of Justice, the Department of Homeland Security, and local prosecutors are being conducted in a different way on different bases.

And so -- and so, you know, the record that I suggest we present here in Ms. Petrova's case echoes that chronology and, sort of, you know, background in many ways.

And, sort of, one of the most unusual things we have here is we have a federal judge in the habeas case in Ms. Petrova's case who makes essentially a preliminary finding on -- in denying a motion to dismiss and says, Ms. Petrova argues she has been criminally prosecuted to divest this Court of habeas jurisdiction and/or to gain an advantage in a civil proceeding by prosecuting her criminally. The Court finds her petition raises substantial claims grounded in the facts and law on which she has shown there is a likelihood she will

prevail.

Now, that's a judicial finding, I would suggest, or finding order, preliminary or not, that maybe doesn't use the words "some evidence," but, I mean, it's essentially saying we have facts and we have law and I think there's a likelihood she will prevail. I mean, if that's not -- if that's not, sort of, some evidence in other words or even more than that, it's hard to know what is.

And, sort of, where does that come from? Well, the -- the litigation in that case, right, that, sort of, led to or was the preamble to the criminal charges, the Court found, as a preliminary matter, right, that there was a showing that the failure to declare something in customs does not provide a basis legally to cancel a visa; it's not a ground in inadmissibility; CBP failed to follow its own procedures; and CBP is not authorized to revoke a visa. So that's, sort of, part of the preliminary legal argument in the habeas court, so, you know, CBP has done something strange, apparently.

Then what happens? On the 22nd of April, the habeas Court sets a hearing for May 14th where, you know, she's already made findings that there's something fishy going on here; we're going to have a hearing on May 14th where I may well order Ms. Petrova released on bail. Then what happens?

So the 22nd of April, that happens. The 2nd of May, we know from the testimony and the probable cause hearing here,

HSI makes a referral from headquarters in D.C. to open a criminal investigation, right, from headquarters in D.C., not something local, not something out of Logan Airport.

Now, you know, the timing there is peculiar. One of the things we're seeking in discovery are the communications inside HSI and among HSI, DOJ, the White House, and whoever else about why that decision was made literally, like, a week or so after the habeas Court says, we're going to consider -- you know, I think something fishy is going on here, and I'm going to consider releasing Ms. Petrova. So that happens on the 2nd of May.

The 12th of May, the Court obtains -- or the government obtains the complaint here. Also, on the 12th of May, there's -- Massachusetts files an amicus brief on the habeas making allegations about how this is part and parcel of the government singling out international students especially from Massachusetts and from Harvard.

It's the day before Ms. Petrova herself publishes an op-ed in the *New York Times*, and it's two days before the scheduled habeas hearing, so the criminal complaint gets issued then. It gets unsealed on the very day of the habeas hearing. And then within about a week, the U.S. attorney is arguing to the habeas Court that, well, now there's this criminal complaint; you no longer have jurisdiction.

So, you know, it certainly suggests that a purpose of

doing this in this way in this time frame was to try and thwart the habeas process. The judge in Vermont disagreed that that would be effective, but, you know, the timing is, I would suggest, extremely telling.

And so that's, sort of -- it suggests, I would argue, that, you know, the criminal charges, either in whole or in part, are designed to thwart the habeas process and try to, sort of, prevent the Court in Vermont from further digging into what CBP did at Logan Airport and whether it was proper or not.

So that's -- that's one piece of some evidence, where a Court has actually said, yeah, you know, I think this is a substantial showing.

The other piece of some evidence is a suggestion of First Amendment retaliation. Now, the government says, well, you know, the *New York Times* op-ed actually comes a day after we got the criminal complaint so that's not what caused this.

But that's not our point, right. What we know is even before May 13th, Ms. Petrova's situation is getting extensive coverage in lots of media including the *New York Times*. She's interviewed. She's made statements. She's out there. There's a report from HSI that we cite in the paper saying HSI is tracking all of this stuff very carefully, right, so that in itself seems unusual.

Then we have May 12th, the government gets its complaint that's under seal; May 13th, the *New York Times* op-ed

offered by Ms. Petrova is published; then on the 14th, the complaint is unsealed and the U.S. attorney makes a statement which doesn't just announce the charges; it actually contains, essentially, an attack on the *New York Times* saying, you know, don't let facts get in the way of -- you know, this is -- now we've filed criminal charges; you shouldn't let facts get in the way of a good story.

Now, that, in a way, right, it's -- it's -- is it responsive just to the editorial -- from the op-ed from the day before? It's not clear.

I would suggest what it reflects is a kind of real animus on the part of the government against Ms. Petrova's exercise of her First Amendment rights and the coverage of her situation suggesting that, you know, the government has gone way, way overboard here.

It's extraordinarily unusual for, you know, the -- the government makes press releases and press statements all the time when charges are filed, right. There's a local rule that, sort of, cabins what can and can't be said.

This statement, which is quoted in -- verbatim in the papers, I would suggest, goes well beyond what we usually see, and it, sort of, suggests the tail end of the dog or -- that's been, sort of, wagging its tail since -- that's probably not the right analogy -- but the tail end of a process that has been going on for -- much earlier, you know, DHS very carefully

tracking all of the -- all of the statements and coverage that's happened here, so, sort of, on two different levels, sort of, two different categories of potential retaliation or vindictiveness; we would suggest there is more than enough of a showing that there is some evidence enough to warrant discovery going forward. That's vindictiveness.

The other part is selective prosecution. For that to get discovery -- again, there's no dispute, and this all, again, comes out of the Supreme Court jurisprudence -- there has to be a showing -- a preliminary showing of discriminatory effect and discriminatory intent.

And, you know, the, sort of, best encapsulation of that is the amicus brief the attorney general of the Commonwealth of Massachusetts files in the habeas case which essentially says what we are seeing in Massachusetts is discriminatory -- both effects and intention, both -- you know, intention just in the words the administration is saying; effect in what we are seeing in our students -- our international students and the way they're being treated, that they are in violation of, sort of, due process rights and, sort of, any sort of reasonable basis in the law being singled out for poor treatment.

And Ms. Petrova is one of the most, sort of, notable examples of that because her treatment, sort of, went way beyond what we've seen in just about any other case except

perhaps the *Ozturk* situation and that arrest.

So, extraordinary, right, you have the chief law enforcement officer of the Commonwealth of Massachusetts saying the government is selectively going after a class of people of which Ms. Petrova is one in a way that is completely unlawful, again, unprecedented circumstances and hard to imagine that that's not some evidence of discriminatory effect and discriminatory intent that would warrant, at a minimum, discovery on these issues.

And so those -- that, we would suggest, is the basis, the principal basis, for discovery requests 16 to 21 in the initial letter, you know. If we got deeper into the weeds, we could talk about each individual one and whether it's appropriate now or appropriate later.

The other thing I would say is, you know, there's almost a bit of a conundrum with this issue. Do we seek discovery about it at the beginning, during the regular discovery process, or do we wait until we file an actual motion to dismiss and seek it then?

In the circumstances here where the facts and background that we already have, I conclude, are so compelling, I thought it makes sense to do it at the preliminary discovery stage.

But what I would ask the Court is, you know, if -- and I hope the Court doesn't disagree with me, but if the Court

were to disagree that there's been a showing -- a sufficient showing now, at least the denial be without prejudice because I expect we will actually file an actual substantive motion to dismiss at which point, if the Court has not already found a sufficient basis, we would renew the request for discovery.

THE COURT: Let me just ask you on your selectiveness argument, you rely -- you're emphasizing the Mass. AG right now. It seems to me there was evidence, though, that in the treatment at Logan, the fact that this was referred for criminal prosecution at all given that it was a --

(Crosstalk.)

MR. FICK: Yes. I'm certainly --

THE COURT: -- is that part of your selectiveness, or does it have --

(Crosstalk.)

MR. FICK: It is part of it, but I think that -- I -- that's, sort of -- that's, sort of, part of the District of Vermont's -- the Courts there are finding also. I didn't mean by any means to, like, forget about that or diminish that. I think that's right.

And it's interesting, right, the government's response to this is, well, it's not that unusual; there are a couple of cases in Michigan where Chinese nationals were prosecuted for bringing, like, roundworms into the country.

Those events are a different situation, right,

because, as I understand the charges there, we're talking about live, biological stuff, absolutely not the kind of material Ms. Petrova was bringing in.

The record -- I don't know that there's any basis to dispute it, this stuff was formalin-fixed, not living, nontoxic, nonreactive, right, very different from bringing -- the cases in Michigan that the government even cites.

And there's certainly -- again, the -- the declaration, the testimony in Vermont, and the judge's conclusions from that do provide another basis for a finding of selectivity.

But I guess what I was focusing on with the Mass. AG is you have to have selectivity based on some unlawful criteria, right, or, like, a protected class.

And I would suggest the protected class here are international -- international students in Massachusetts who are being singled out in a way that's inappropriate, but the factual underpinning for showing selectiveness is broader, the Court's exactly right about that, and I was remiss to forget about mentioning it, so that's -- that's sort of that piece.

I can go on to some of the other categories of information if the Court wants --

THE COURT: Let's divide it.

MR. FICK: -- or we can do it in pieces.

THE COURT: Let's divide it. Let's focus on this, and

then we'll -- then we'll deal with the specifics. So in the specifics, I do want to deal with the jury instructions --

MR. FICK: The grand jury.

THE COURT: -- as a separate category as well, but let me hear from the government on this.

MR. FICK: Thank you.

MR. HOLCOMB: Thank you, Your Honor.

And just to preview, in the government's view, I think based on the government's response, the main two categories of discovery that are at issue today are the selective and vindictive prosecution discovery requests and the grand jury legal instruction requests because I do think that everything is -- else has been responded to at this point.

I will start by just disagreeing with Mr. Fick that we agree on the legal standards because I think the defense's motion is clear that we don't because they didn't cite the controlling First Circuit standards for either vindictive or selective prosecution.

With respect to -- I'll take each in turn, but with respect to *Bucci*, the vindictive prosecution case, the question isn't whether the facts are similar to *Bucci*. The question's whether *Bucci* sets out the controlling standard in the First Circuit, which is some objective evidence, which it does, and that's a different standard than what the defense applied in its motion; and same thing with the *Lewis* case with respect to

selective prosecution, this morning is the first time that the defense has elaborated on how the evidence somehow satisfies the *Lewis* requirements of both discriminatory effect and discriminatory intent. The motion --

THE COURT: But as we stand here today, I had actually written that the parties agree on the standards, so are we working off of the same standard now, the *Bucci* standard, for some objective evidence, and then the discriminatory effect and intent for the selectiveness?

MR. HOLCOMB: Your Honor, I just highlight that to point out that I think we are today.

THE COURT: Today.

MR. HOLCOMB: I think we are today.

THE COURT: All right.

MR. HOLCOMB: But --

THE COURT: Whether I read the briefs differently or not, I just want to make sure we're on the same page right now.

MR. HOLCOMB: Yes, Your Honor.

And so let me address selective prosecution first, and, again, this morning is the first that the defense has articulated any theory of discriminatory effect or discriminatory intent.

One of the requirements is that -- identifying a protected characteristic; the motion does not do that at all. As I hear it this morning, the protected characteristic is

allegedly a class of international students that have been, according to the Massachusetts AG's office, allegedly targeted.

But that doesn't do what the *Lewis* standard requires. Under the *Lewis* standard, to prove discriminatory effect, the defense bears the burden of showing that there's a class of individuals who don't share the protected characteristic that have not been prosecuted for doing the same thing, and the *Lewis* case walks through that when it discusses the defining of the pool of similarly situated defendants.

THE COURT: But wouldn't one of the pools here be persons who have things confiscated at the airport are not prosecuted at that point by customs and border patrol but have criminal proceedings brought against them? I mean, isn't that sufficient?

MR. HOLCOMB: No, Your Honor. And *Lewis* says it is not, because what the -- the First Circuit in the *Lewis* opinion explained is that in defining the pool of similarly situated offenders, it must be done in relation to what the First Circuit called material prosecutorial factors.

It's not just everybody else who, as a routine matter, may have failed to declare something but rather looking at who is -- who can be said to be similarly situated has to be done considering the facts that would fairly be material to prosecutors, and the *Lewis* Court identifies those to include the manner in which the offense was committed, the efficacy of

deterrence of bringing a case, and the nature of the evidence.

And so there are these material factors that the government -- that *Lewis* acknowledges that the government can consider in deciding whether to prosecute one person for committing an offense and not another person.

THE COURT: So who would be similarly situated here?

MR. HOLCOMB: I think it -- it would have -- so I don't know that we're at that point in defining a pool of similarly situated people.

But here, I would say, at a minimum, it would have to take into account the level of planning or indications of forethought that went into concealing the items and not declaring them and the -- the nature in which it was done, the false statements to the officers.

The *Lewis* test and the material prosecutorial factors does not -- does not lump everybody who happens to have walked into the country together -- and not declared something together.

I think in the *Lewis* case, the question was in the -- the -- I think it was a counterterrorism example, and it included, you know, the -- if I may, Your Honor, I just want to pull the case out -- so the First Circuit in *Lewis* said in configuring the pool of similarly situated offenders, no fact should be omitted to make it out completely; material prosecutorial factors are those that are relevant, that is,

that have some meaningful relationship either to the charges at issue or to the accused and that might be considered by a reasonable prosecutor.

THE COURT: So would the class be -- would the similarly situated be persons entering the country on international visas who fail to declare and how they were treated at the airport? Do we divide that --

MR. HOLCOMB: I would say, Your Honor --

THE COURT: -- before the changes in policy and after?

MR. HOLCOMB: I would say, Your Honor, that it's even more specific, that it would include individuals who have demonstrated some premeditation or planning in the smuggling of items into the U.S.

THE COURT: But how do you get that without discovery? I mean, I understand that as an argument to differentiate any claim that is actually pursued, but we're dealing here right now with discovery.

So he's put forth -- the defendant has put forth evidence that goes unchallenged at this point but, obviously, will be challenged, that there has been virtually no similar prosecutions of persons entering on foreign visas who have -- who have failed to declare things then being criminally prosecuted for it without the border patrol proceedings being completed. I mean, that's the evidence that I have, that she was treated differently than anyone else.

So the question that I have is whether that's enough just to get discovery, whether it ends up ultimately being able to be differentiated on the grounds of individuals.

If nobody else was prosecuted, as he asserts, then I guess you're going to say nobody else planned it to the degree that she did. I don't know.

MR. HOLCOMB: Well, I think that's correct, Your Honor. And let me just say that the *Lewis* case is about entitlement to discovery not ultimately making out a selective prosecution claim.

THE COURT: Right.

MR. HOLCOMB: And so this is the, kind of, threshold issue of the showing required to get discovery, and so what the -- what the circuit says is that in determining whether a sufficient enough showing has been made, the Court has to consider these other factors that may have legitimately influenced the government's decision to prosecute one individual but not another, and the Court says these may include, among others, the comparability of the crimes, the similarities and the manner in which the crimes were committed, the relative efficacy of each prosecution as a deterrent, and the equivalency of the evidence against each prospective defendant.

And so I do understand the concern about -- or the general claim that, well, this seems to be a selective instance

of prosecuting somebody for failing to declare, which is something that we may, just as a general matter, assume that plenty of people do. The example that Mr. Fick has made on several occasions is if I bring in an Eiffel Tower magnet and fail to declare that --

THE COURT: I think it was something from Mexico, wasn't it?

MR. HOLCOMB: That's the scorpion encased in plastic, I believe that was the favored example of the habeas Court.

But, in any event, Mr. Fick's example, I come in and I fail to declare an Eiffel Tower magnet. That person may not be in the same class as Ms. Petrova for a simple failure to declare a little souvenir.

The prosecutorial factors that the First Circuit just enumerated all go to what it was that Ms. Petrova is alleged to have done, the comparability of the crimes. That's not a comparable situation if somebody brings back a souvenir from another country and just says, I'm not going to declare it and walks through.

That's different than texting with your coworkers in advance and concealing frog embryos, research samples in two different bags, and not declaring them and then when first being confronted by a CBP agricultural specialist about whether you have biological materials saying no and then only then presenting the research samples that you are carrying through

the border. Those are two separate manners of an offense or a violation, I should say, because it's --

THE COURT: But the evidence that I have in front of me on this, obviously, very abbreviated record, is that regardless of whether somebody was bringing in the magnet or bringing in biological samples or whether we define biological the same way or not, nobody's prosecuted, that the -- that the samples are taken away, that they're sent home, that they're investigated, and then there's a time that lapses before something's done, and that there are not comparable circumstances where somebody is found ineligible to come into the country, that their documents are invalidated at that point, and that they're subsequently prosecuted.

And I think the argument is that the subsequent prosecution is to prevent the investigation as to what went on at Logan; right?

MR. FICK: In part.

THE COURT: In part. So I understand that there could be a lot of basis -- you know, we spend our lives separating and merging facts to our -- he'll take a broader class; you'll take a more narrow class, but right now, I have no -- nothing. Like, I have that she was just treated differently than anybody else who has come through here, whether they thought about it, whether they had a text on them or not, whether they communicated with coworkers, the evidence in this record that

was presented to the habeas judge was it's never happened before.

MR. HOLCOMB: Well, Your Honor, I think the point is that *Lewis* says that that's not enough. To, sort of, look in general and say, I don't have another example of this is not the -- the --

THE COURT: It's not the end.

MR. HOLCOMB: -- showing. It's not the showing that the defendant has to make. What the defendant has to show -- and this is what *Lewis* says -- is that somebody similarly situated committed this offense but was not prosecuted for it.

And so the question is not, you know, is there an absence of examples? The question is: Are there specific examples where somebody was not prosecuted and did not share the same characteristic that the defendant -- the defense is pointing to that Ms. Petrova was supposedly discriminated against for?

And so *Lewis* is clear on that, is that the first -- one of the steps, an earlier step, is defining the pool of who's similarly situated, but after that, the defense has the burden of showing that there are examples of people who are similarly situated and were not -- and did not share the trait and were not prosecuted.

And so I -- I think the Courts recognize that it's a rigorous standard, and it might not be one that is easily made

prior to discovery, but that said, this is the requirement for being entitled to discovery into selective prosecution.

If -- Your Honor, I think unless you have any more questions about the selective prosecution arguments, I'll just move on to vindictive prosecution.

THE COURT: That's fine.

MR. HOLCOMB: So here just to, you know, quickly rehash the applicable standard from *Bucci* or the guidance from *Bucci*, it's some objective evidence tending to show the existence of prosecutorial vindictiveness.

The defendant has to do more than suggest a potential motive for prosecutorial animus. The defendant must connect any alleged prosecutorial vindictiveness to those making the charging decision, and the defendant cannot rely on allegedly suspicious timing alone.

And I do want to just point out that I think the argument is a bit of a moving target because the motion goes -- the entire first half of the motion addressing these arguments without pointing out that the real first date of charges was May 12th, the day prior to the *New York Times* op-ed and two days prior --

THE COURT: You know, you relied a lot on that argument, and I have to say I found it frustrating, because the issue of the validity of the conduct was at issue from the day after, from February 23rd, when the habeas petition's filed,

right, and then she's transferred to Louisiana the next day.

It's not -- she's in limbo. There's no hearings. There's no prosecution. There's no move to charge her with anything. There's nothing happening.

It seems to me that April 22nd is your key date, right; that's the date that the Court says, I'm uncomfortable maybe with what happened, but at least I'm giving you a hearing, and I'm giving you a hearing on May 14th.

And that's when the investigation allegedly starts and the charges are brought. I mean, I think you have a -- to argue that I should focus on the fact that the complaint was put forth on May 12th ignores the fact that the issue has been percolating and briefed and made public well before then.

MR. HOLCOMB: And, Your Honor, I apologize if the government, kind of, hit that point too hard, but I think the reason we hit that point hard in our opposition is because the defense highlighted it in its motion.

It said that the *New York Times* op-ed -- its actual argument with respect to the *New York Times* op-ed and the U.S. attorney's statement is that the U.S. times -- or the *New York Times* op-ed provoked the charging decision, and so the point of hitting it hard in opposition is because it's a factual impossibility because she was charged at that point.

And the same thing with respect to the May 14th hearing that the defense's motion painted as this big victory

for her and that hours later we rushed to unseal charges as if there's some significance there, when, in fact, she was already charged two days prior, and so -- but I think if I may address --

THE COURT: Yeah. Let me just --

MR. HOLCOMB: -- your larger concern.

THE COURT: I think everybody's arguments have evolved, but the facts -- let's just deal with the facts, all right, and I think the facts, as chronology is undisputed, in that we have no hearing until April 22nd; at which point, I don't know if there was a hearing or not, but on April 22nd, there's a hearing scheduled for May 14th. I think that's clear on the record.

I think the testimony at the probable cause hearing was -- on May 2nd, was when the referral came in to start the -- to open the criminal investigation. May 12th was when the complaint was presented. May 14th is when the habeas hearing took place, and then shortly thereafter on May 25th, the government argues to the habeas Court that the institution of criminal charges mooted the habeas petition, so there's clearly a connection between the proceedings in the habeas court and the proceedings in this court.

MR. HOLCOMB: I disagree with --

THE COURT: Okay.

MR. HOLCOMB: -- connection, Your Honor. I agree that

there's an interplay. And just to correct one point Mr. Fick made, he said the U.S. Attorney's Office then went to the District of Vermont and argued in the habeas proceeding that the Court didn't -- no longer had jurisdiction over those claims.

The U.S. Attorney's Office had no part in the habeas proceedings. We haven't intervened at all. The government -- the part of the government responding to that -- or involved in that case, party to that case, may have made that argument, but the U.S. attorneys -- it's incorrect to say that the U.S. Attorney's Office said, District of Vermont you no longer have jurisdiction over her habeas claims.

THE COURT: So what's this May 25th reference in the papers? It says DHS argues to the habeas Court that the institution of criminal charges mooted the habeas petition. Are you aware of that?

MR. HOLCOMB: As I understand -- well, I accept it as -- you know, I accept the representation that that's what happened in the habeas proceeding. I don't have intimate knowledge of the habeas proceedings, but if that's -- that's what DHS, apparently, argued.

But it is not what the U.S. Attorney's Office, which has charged this criminal case, took as a position, because the U.S. Attorney's Office has taken no positions in the habeas proceedings. It has not intervened in the habeas proceedings

at all, and so that's why I disagree with the characterization of a connection.

And I think this is the problem with relying too much on a chronology and dates because it often invites inferences that just as easily could be made at any point along the chronology.

If she had been charged immediately after or a week after claiming asylum and first filing her habeas petition, it's a very common argument in these types of cases alleging vindictive prosecution that the closer in time to the exercise of the right is more indicative of retaliation.

And so here, the argument is that the further in time is more indicative of retaliation, and there's no objective evidence to base either conclusion on.

The defense asks the Court to draw an inference, but it's not a particularly supported one when you have a chronology that relies on one thing happening in the habeas case on April 22nd, as Your Honor has just noted, and then a referral being made on May 2nd and assuming, just because the May 2nd referral happened after the April 22nd hearing, that one somehow caused the other.

I think that this -- it shows the issue with relying on inferences from a chronology as objective evidence because there's no other objective evidence pointing to any relationship between those two things.

And so the chronology --

THE COURT: I'm a little confused on your argument that DOJ wasn't involved in the habeas petition, so that -- I'm supposed to assume you knew nothing about it.

I mean, DHS argues to the habeas Court and DHS is in front of the habeas Court and it's saying that the criminal prosecution moots the habeas petition, which their argument being, I assume at that point, that don't look -- if it had succeeded in that argument, the events at Logan would no longer be -- the jurisdiction of the customs officers would no longer have been the primary issue, right. You would have been focused on the criminal charges.

But DHS is clearly in -- aware of and informed about the criminal case. I mean, the government -- are you making some kind of wall between justice and what went on at the habeas court?

MR. HOLCOMB: Only in the sense, Your Honor, that it's the U.S. Attorney's Office that made the decision to charge this case and the -- the inquiry here as to vindictive prosecution is whether there was any retaliation on the part of those who made the charging decision.

And so I'm not making an argument about some greater wall or denying any sort of awareness that DHS, as a party in the habeas suit, had about the criminal case.

But this is where I go back to the point that, you

know, what this shows is interplay between the cases, not causality or connection and certainly not any objective proof that the U.S. Attorney's Office only took up this case or in large part took up this case in order to thwart the habeas proceedings as the defense suggests.

And I think that when Your Honor considers the record --

THE COURT: I'm just trying to figure out if you're -- listen. I was presented with the complaint. It had nothing in it about all of these other events, you know, but the affidavit, that went with the criminal complaint here, so do I look at the actions of the government in -- as a broader entity, or do I need to -- I don't know the answer to this -- do I need to focus just on the U.S. Attorney's Office in Boston on why they brought the prosecution?

MR. HOLCOMB: *Bucci* says that the Court needs to focus on those who made the charging decision, and I acknowledge that there is case law in which that is -- that question is resolved to encompass, you know, situations where there may have been pressure from another government body, but that's -- that's where there's been evidence of that, objective evidence of that.

THE COURT: And that's what he's seeking. He's seeking, right, the communications between the entities that led to the -- the decision to request a criminal prosecution.

MR. HOLCOMB: He's seeking that, but *Bucci* also requires him, first, to show some objective evidence that that occurred, and besides inferences from a timeline that the defense asks the Court to draw, there is no objective evidence that that's what occurred here, and so under, you know, the guidance from *Bucci*, the Court should look to those who made the charging decisions. In this case, that was the U.S. Attorney's Office.

And I want to go back, Your Honor, to what is the record that the Court considers, and just -- you know, that includes what the allegations are, and I just want to address how those tie in to those material prosecutorial factors that the First Circuit said are entirely permissible prosecutorial considerations.

They are in the selective prosecution context, but as we know, selective and vindictive prosecution analysis is fairly similar.

So what the record, you know, also contains is that what Ms. Petrova is alleged to have done. She's alleged to have carried unidentified research samples into the country in vials and on slides; some of them were on ice, and she told her principal investigator in advance that she was doing that.

The CBP agricultural specialist whose job it is, in part, to assess potential bio threats discovered some of the samples in Ms. Petrova's bag. At this time, he does not know

what these things are. She has not declared them, and he cannot know in that moment what they are just by looking at them.

And so I just want to reiterate the government's position that the question isn't -- the question of deterrence isn't over just when Mr. Fick or the defense says that these things were nonliving and nonthreatening and nonharmful. This is not an all's-well-that-ends-well situation.

At this time, the CBP agricultural specialist does not know what these are, and that's, in part, because Ms. Petrova has acted to impede his ability to do his job.

He asked Ms. Petrova whether she was carrying biological materials. She at first denies it, then she herself identifies the other research samples that she was carrying, those that she had on her person that -- in addition to the ones that the CBP agricultural specialist had already discovered in the bags, and then a review of her phone shows that she had been texting in advance of arriving to the U.S. about getting research samples past customs.

And these messages demonstrate that she knew CBP likely would not -- or they at least suggest that she knew CBP would likely not let her in -- come in with the samples, whether they were harmful or not, so she intentionally impeded its ability to do its job. She made the decision for herself that I'm going to not show -- not let CBP see that I have

these.

And so the reason I hit these points again is to emphasize this is not the aberration of a case that the defense keeps making it out to be. The --

THE COURT: The concern is -- as I understand it, is that somehow, then, CBP invalidates her visa and is prepared to send her back to Russia, and there's a question as to whether they have the authority to do that at the airport given this fact -- facts as you've put them forward, right. You can't ignore those facts in their claim that she's treated differently.

MR. HOLCOMB: Well, the question here is whether she's treated differently in being criminally prosecuted and --

THE COURT: Well, the criminal prosecution claim is that you had a problem with the way things went at Logan and that to avoid an analysis, an in-depth study, of what went on at Logan, the criminal charges were brought to thwart the habeas Court from dealing with the cancelation of her visa and subsequent treatment.

MR. HOLCOMB: Your Honor, I agree that's an allegation here, but it's an assumption. It's an inference that's drawn, and what I'm pointing out --

THE COURT: Well, then they say that the government in this case offered to defer prosecution if she would self-deport, so I don't know -- I have no idea if any of this

is true. I mean, let's make that clear. I have no idea what is true here, but there's clearly a connection with what's going on and her status in the United States.

MR. HOLCOMB: I disagree, Your Honor.

And what I'm trying to emphasize is that the U.S. Attorney's Office, as a prosecutorial office, has its own separate interests in prosecuting this type of offense as it was committed by Ms. Petrova.

And so just because there is also this habeas proceeding happening at the same time does not mean that the U.S. Attorney's Office's prosecutorial decisions are per se related to what is happening in those cases.

And the facts -- the allegations, as I've laid them out, explain why the prosecution has a clear interest in prosecuting a case like this that involved this level of forethought and caused this type of confusion to -- among the people at the airport who are required to be monitoring for biological items.

And the facts that there are also civil proceedings, I don't mean to just sweep them under the rug, but what I do mean here is that those don't negate any interest that the U.S. Attorney's Office has in prosecuting a case like this.

And so it's easy to see that these two things are happening at the same time and conclude that there's a connection, but what the defense is required to show is some

objective evidence that there is a connection, that those who made the charging decision were motivated by animus or retaliation for what she was doing in the civil case.

And the mere fact that they were happening at the same time and that there is some interplay there is not enough in terms of amounting to objective evidence for being entitled to further discovery into that allegation.

THE COURT: Thank you.

MR. FICK: Just a few responsive points, Your Honor. First, on the issue -- Your Honor's right that there was an offer to self-deport if she would -- defer prosecution in exchange for self-deportation. If the Court wants sworn information or documents on it, we can provide it.

THE COURT: It's in the papers.

MR. FICK: It's in the papers.

So the issue here -- I mean, I think what the government is trying to do is to say, okay, the conduct was really bad here, and if you look at what the U.S. Attorney's Office did in isolation, there was a basis to bring the charges and you should look no further.

And I think that is a kind of artificial isolation of the factual record here that just doesn't withstand scrutiny. It's a kind of -- like, it's a kind of almost laundering of the prosecution decision, right.

I mean, I think what the record suggests, what the

*Abrego Garcia* case suggests, is that what is happening here is that the White House, DOJ, DHS are, sort of, using U.S. Attorney's Offices -- local U.S. Attorney's Offices as chess pieces to, like, make a move in some overall scheme or effort to promote their own interests, right.

And so to suggest that as long as what Ms. Petrova did is allegedly really bad and, like, you know, distinguishable and worse than what other people did -- and, by the way, those are all disputed facts; I mean, among other things, the discovery we have gotten, for example, of the audio and video of the airport contradicts what a lot of the reports say about what she supposedly said and what was said to her, so put that aside; I mean, those are factual things for another day -- even if she committed a really bad version of this crime, it is still unconstitutional to prosecute her for a vindictive reason or on a selective basis, right.

The point isn't what she did. It's why the prosecution is being brought and whether it is vindictive or selective.

And the connective tissue we have here is that, you know, we know this was not just like a sui generis decision of the Boston U.S. Attorney's Office to prosecute the case.

We know from Agent Goldsworthy's testimony at the probable cause hearing that this all began with a referral from DHS headquarters to a special agent of HSI on May 2nd. That is

what set the ball rolling and became a prosecution in this district.

So you can't sort of, you know, hermetically seal the prosecution of this district and say, well, everyone here is well-intentioned and they had a basis to do it, when, in fact, like, you're sort of leaving out the but-for cause of all that is happening, and that came out of DHS headquarters in D.C., you know, and based on what we, kind of, want to understand, right, who is -- who is -- who is the driving force moving these chess pieces, right? Is it the White House? Is it DOJ? Is it Kristi Noem? Is it somebody else at DHS or CBP that doesn't want scrutiny of what happened here? That's where this began, with an HSI headquarters referral on May 2nd.

Now, you know, if I said that -- you know, if I said in my -- in my presentation here that the U.S. attorney in Boston made an argument in Vermont, no, I didn't mean to say that.

But the United States Government, DHS in Vermont made an argument that there is no jurisdiction because there's this criminal case going on here in Boston.

The issue isn't who said it. It's what that tells you about the motivation for why this all happened in the first place.

I mean, habeas Court starts to do stuff to Ms. Petrova's benefit. It's going to be looking into this,

sets a hearing. Within, like, a week there's an investigation initiated by DHS headquarters, then there's a criminal charge made just before the hearing announced on the day of the hearing, and then within a week of -- week or so, 10 days of the hearing the government's in there arguing -- the government, somebody from the government, that, oh, yeah, there's a criminal case now so, you know, we're all done here; this is all moot, right.

That's the story, and you can't, sort of, hermetically seal or look at one piece in isolation and say, oh, well, that piece looks okay so we're all -- we can all just go home.

And I think the same kind of argument is what the government winds up using on the selectiveness issue also. I would argue selectiveness is a bit of a trickier, maybe a harder showing than vindictiveness is, and they are separate.

On selectiveness, the government says, well, you know, there are all these things about Ms. Petrova's case that make it different and so that's why she was prosecuted.

And I think Your Honor is exactly right, I mean, even if maybe, you know, that makes it distinguishable, it still raises the question that is commenced by the expert testimony in the Vermont case, that, like, even if what she did was, like, different or maybe a little bit worse in some way, which is disputable, nobody gets prosecuted for this stuff, certainly not in the way she was, so that's at least some evidence on the

selectiveness points that I think gets us over the hump of at least some discovery.

So -- and, you know -- and, you know, the Eiffel Tower example, I don't think that's -- that's not, I think, the class you would compare her to, right.

And the other problem we have is that what goes on in CBP at Logan Airport is a black box. There is no, like, information that's otherwise accessible to us at this preliminary stage to even make the comparison, so really the best we can do is the expert testimony to say, this is weird; this is sui generis; this never happens, right.

It's not, like, say, a case -- if there were a federal prosecution, say, of a trade secret criminal violation and we want to say that our client is being ethnically profiled; he's Asian American and only Asian Americans are getting prosecuted for trade secret thefts, we don't know what else, there we would have data. We could look at all the civil trade secret cases that are brought and see what the surnames are of the people in those cases and then compare those statistics to who gets prosecuted for those, right. There's actually a way, at least, for the defense to make a somewhat prior showing.

But what happens at Logan Airport it's a black box, but I think we can certainly infer just from personal experience that, you know, putting aside Eiffel Towers, people come in with stuff, meat, animals, fruit. They don't

necessarily get prosecuted for that even though, I think the evidence would show, that, like, an animal or a piece of meat is probably much, much, much more dangerous than the fixed -- the fixed, inert model unliving samples that Ms. Petrova brought in.

So, you know, the debate about what's the group and how you compare and is this really worse or not, that's, sort of, a debate for another day, but I think the initial showing at least we may need it for discovery, I think we've cleared that hurdle pretty clearly.

MR. HOLCOMB: May I just respond to a couple points, Your Honor?

First, just on the similarly situated group question, I'm sorry, I did not have this readily handy earlier, but the *Lewis* case, its specific example the defense claimed that the -- that he was -- the defendant claimed that he was prosecuted based on his race and religion, that he was African-American Muslim, and that that was, therefore, the similarly -- that was the class of similarly situated offenders that he was to be compared against.

And the Court disagreed with that and denied his discovery motion and applied a -- determined that the pool of offenders situated similarly to the defendant consisted of non-African Americans and/or non-Muslims who had committed multiple misrepresentation offenses in connection with

firearms, paperworks, who posed a danger of violence, and who may have had links to terrorism which were three characteristics that applied to the defendant in *Lewis*.

And so I point that out just to show the level of specificity that goes into the analysis of who's actually similarly situated in deciding whether somebody's been selectively prosecuted.

Going to Mr. Fick's point about it's hard to obtain evidence in support of these claims, that may be the case that in some cases it is hard to obtain evidence to meet the standard for discovery.

But that doesn't change what the standard for discovery is for either selective or vindictive prosecution, and it doesn't enable the Court to draw inferences or accept inferences in place of the objective evidence that's required.

And so Mr. Fick suggests that -- I would say speculates that there was all these things going on at the higher levels of government that caused our office to prosecute this case and that must have been the case because he alleges we see it elsewhere and so -- so that's evidence of vindictiveness. None of that is objective evidence that entitles the defense to further discovery into that claim.

THE COURT: I'm going to assume that you're going to want a written decision on this.

MR. FICK: I think -- I don't mean to create more work

for the Court, but I think, as Your Honor has heard and I think Your Honor has even indicated, there's some complex and interesting things going on here, so yes.

THE COURT: Yes. So it will take me a little while, but I will tell you I am going to allow some discovery. I do think that this is an exceptional case.

Everybody's quoting cases that have more traditional crimes and more traditional chronologies. I think there is a clear, strong implication of the interrelatedness between the habeas proceedings and the criminal proceedings here.

I think there's been a strong enough showing that the government brought criminal charges to thwart or retaliate against Ms. Petrova's exercise of her rights to challenge her immigration -- her treatment as it -- as someone in the United States with a visa.

I find it as objective evidence the habeas Court found that she had put forth sufficient evidence that the immigration proceedings were initiated for an improper purpose and the failure to declare items is not grounds for canceling a visa or inadmissibility, and that without even processing her for failure to declare a violation initiated criminal proceedings and that the CBP had exceeded its authority.

There seems to be -- the Court was presented with hearings and affidavits and evidence, and I find that, for discovery purposes, that finding by the other Court is

persuasive.

I think what the government is arguing here, as Mr. Fick actually put it so well, it's an artificial isolation of facts. I think the chronology has to go back to the fact that this prosecution at the -- this treatment at Logan was questionable from the beginning.

I find that while chronologies are not the end all and be all, there is evidence that I can consider, and the fact that the criminal prosecution was not initiated until a hearing date had been set and that the criminal complaint was brought, I believe, late on a Friday afternoon before the Monday hearing or Tuesday hearing; I think the 12th was a Friday, maybe not; I may be off a day, but it was late in the day that the criminal proceeding was brought on the eve of the habeas hearing is significant.

I think that there's a strong correlation -- I draw no inferences for or against the actions of this U.S. Attorney's Office of the individual assistant U.S. attorneys. This appeared on the paper to be a straightforward case of environmental concern, let me put it that way, but there were clearly a lot more facts going on and that I think the sequence is important.

And I think the fact that DHS argued that -- I think there are -- I'm sorry -- this is not very articulate, but at the beginning even at Logan, she was offered the right to

self-deport. DHS then argues that the hab should stop because of the criminal proceedings.

While these proceedings are going on, the defendant is, again, offered the opportunity to self-deport. It's hard to ignore the fact that there's a connection between the criminal proceedings and her status in the United States.

I think I've already mentioned the May 12th date to me just is a red flag that it is connected to the May 14th hearing.

I will make this all clearer, and I do think that we're all on the same page on the standards to be applied. I appreciate the briefing, and I appreciate the arguments. I will try to make it articulate. It will take me a little while to get the decision out, but there will be some discovery here.

And with that in mind, I'm going to ask counsel to take the time while I'm doing my homework to do some more talking among yourselves as to whether the scope of discovery needs to -- can be agreed upon or whether we need further hearing on that. I don't want to go into that right now. Okay. All right.

MR. FICK: Your Honor had mentioned a couple of other topics. I know we've been at this a long time.

THE COURT: Go ahead.

MR. FICK: So the two, I guess, that are -- sort of, the chief ones hanging out there still are the grand jury legal

instruction request, which is number 24, and the policies request, which is 27 to 29.

And if I'm not mistaken, I don't think the government really addressed the policies request in its papers. I mean, those are -- I mean, they also actually, I think, go to potential vindictive and selective prosecution issues, but those aren't the real reasons I was asking for those.

It was more to be able to, you know, impeach trial witnesses and perhaps also address the constitutional vagueness questions about, you know, what is and isn't a potential subject for -- or, you know, what is or isn't declarable at the border and what actions CBP is going to take on these bases, so those were 27 to 29.

The more interesting, I guess, issue that is -- was disputed or joined in the papers was the grand jury instruction issue.

THE COURT: Let me just say the 27 to 29, they included in the vindictive or selective prosecution category.

MR. FICK: Okay.

THE COURT: So I --

MR. FICK: I mean, I think those are more broadly relevant. I mean, I think those are the kinds of things we look for in many criminal cases where, you know, the conduct and credibility of the people who are interacting with Ms. Petrova at the airport is, you know, an important way to,

sort of, assess and impeach, where appropriate, that conduct as to see what are the policies and procedures, what are they supposed to do, what -- you know, and how is their discretion guided.

And it has a separate additional relevance here because I expect we'll be making a dispositive motion regarding the substantive charges, especially the smuggling charge, on, sort of, a due process notice argument that how is -- you know, what are the contours of what one is required to declare or not declare and what notice is given about that and what criteria do government agents act on when deciding how to address that, so I think there were, sort of, different reasons for relevance in addition to vindictive prosecution for those three requests.

Although, I mean, maybe if it's part of the vindictive -- you know, if we're going to get discovery on this anyway for vindictive prosecution, maybe it comes up as a wash.

THE COURT: Well, I'll let the government respond in a minute. It did seem to me that they were producing copies of all signage --

(Crosstalk.)

MR. FICK: Yeah --

THE COURT: -- and --

(Crosstalk.)

MR. FICK: -- the wall signage, yes, we've gotten those, and I think there's still a video that we're expecting

or something. That one, I think, is sort uncontroversial now, but I think the 27 to 29 were more the policies, if I'm not mistaken, right, the -- 27 to 29 are all written policies or procedures concerning, you know, border inspection, guidance to CBP about how to refer things for criminal prosecution and then policies and procedures about the K9.

So, you know, I think those have broader relevance to the case if it goes to trial in terms of the cross-examination of the government's witnesses and potentially a due process notice argument at least as to some of them.

THE COURT: Then I'm going to ask the government to look at those separately even if you're still challenging -- I'm assuming you're going to challenge the production of documents on the vindictiveness and selective prosecution, those we'll deal with as 16 to 21.

MR. HOLCOMB: Yes, Your Honor. Just so you know, I think, you know, the government would just ask for an opportunity to assess, in light of the Court's order, how narrowly or broadly the Court intends to allow discovery.

I don't know if the Court anticipates looking request by request and saying this falls under the category of a narrow vindictive discovery -- or vindictive prosecution discovery that the Court will allow or what, but I think at this point, that's still to be seen, and so the government would request an opportunity to respond.

THE COURT: So I guess what I'm asking you to do is look at 27 to 29 as a non -- as separate categories exclusive of the Court's ruling on selective and vindictive prosecution and see if you still object to the production of those documents. Okay. And 16 to 21, we're going to assume, are the ones that are clearly at issue here.

What I anticipate is having you -- giving you the opportunity to talk, let me know whether we still have an issue of scope, but once I issue my decision, I expect to have you come back in, and we can deal with it item by item if that's still an issue or not. I don't know, but that's why I'm giving you a heads up so that you can see if you can agree on the scope assuming that my order allows them discovery. Okay.

So that's important, and I hear you, and I will include 27 to 29 both -- both as separate categories and as part of the ones at issue today.

MR. FICK: And then as to the grand jury instructions, you know, I think a lot of the, sort of, boilerplate case law the government cites about grand jury secrecy, I mean, is well placed, but it's about, sort of, witnesses and testimony in evidence not about the legal instructions.

And I think Judge Burroughs' decision on that is quite persuasive, and there are some others that we cite also about defense access to jury instructions.

And there are a couple reasons why it's particularly

important here. One of them is in -- especially in a situation where at the probable cause hearing the government agent with decades of experience has difficulty defining terms at issue in the criminal statutes charge, you know, you may be -- the old saying that you can get a grand jury to indict a ham sandwich may be true, but I think we really need to know what instructions were given to the grand jury here about what constitutes the crimes.

And that's -- so that's true both because of the ambiguities and the lack of clarity even in experienced government agents' discussion of these crimes and where we have this really peculiar record of -- you know, I think the transcript of Mr. Trim's testimony that's in the motion, I've never seen anything like it, right.

It's not just that a witness is going to, like, testify off the cuff and, like, go off on a tangent. He is trying to provide context to his answer to government questions and he's trying to answer questions from grand jurors and he's getting cut off. That's very unusual.

And that's another, sort of, piece of, you know, in this unusual proceeding why we think insight into what instructions were given to the grand jurors and whether those were legally appropriate are relevant, interesting, and there shouldn't be any barrier, we don't think, or any special showing needed for that production which I think was consistent

to Judge Burroughs' ruling which I thought was persuasive.

MR. HOLCOMB: Your Honor, it's not consistent with Judge Burroughs' ruling because what the defense's motion leaves out is what she ultimately did in that case.

She -- the defense excerpts her view on why it's less important to show a particularized need for legal instructions, but in that decision, she says, but against the weight of First Circuit precedent and the facts here, I will not find -- I will not disregard the requirement of a particularized need.

And so even the -- the best case for them comes out the other way, and the Court here should not disregard the requirement in this circuit and in this district for a particularized need for disclosure of legal instructions to the grand jury.

And is there a particularized need here? There isn't one that's been articulated. There's no alleged defect in the indictment suggesting that the grand jury may have been instructed on a particular legal term the incorrect way.

I really do have to take issue, again, with Mr. Fick's continued mischaracterization of the special agent's testimony. I think the motion mischaracterizes what the transcript shows.

This Court sustained objections at the probable cause hearing when Mr. Fick tried to ask the witness for legal definitions or legal conclusions. That happened multiple times with multiple different terms.

And, in any event, it's all beside the point because the special agent was not the one who instructed the grand jury on the legal elements of the offenses and so on.

And so any bones that the defense has to pick still with Special Agent Goldsworthy's testimony really is irrelevant to the legal charge, and Mr. Trim's testimony in the grand jury is also irrelevant to the legal charge.

We, obviously, disagree on the defense's characterization of what happened and what he was supposedly not allowed to put out there.

I think the transcript actually shows that he was trying to give -- give remarks not tied to any question, and it's unclear how the defense says that whatever it was that he was going to say is somehow relevant at all to the legal charge, let alone exculpatory, as the defense claims, but, in any event, there's no real connection between Mr. Trim's grand jury testimony and the legal instructions here.

THE COURT: So the only question that I have is that they -- the testimony at the probable cause hearing was confusing. And at the end, the government asked for more time to brief some of the elements, one of the elements, of the smuggling charge.

And while that -- before that briefing took place, the indictment took place, so we didn't continue with that issue, so there were elements that were in dispute or undefined at the

conclusion of the probable cause hearing.

MR. HOLCOMB: Your Honor, I agree that there -- excuse me -- were areas of confusion from the probable cause hearing. I can tell you what one of them -- what caused one of the areas of the confusion, which is that --

THE COURT: Me?

MR. HOLCOMB: No. No, Your Honor. It was actually an error -- a clerical error in the complaint affidavit because the -- while it's clear from the complaint affidavit that it charged smuggling under one section of the statute, the language at the end -- or, I guess, the citation at the end cited a different section of the smuggling statute which actually involved or made reference to defined terms and legal concepts that are just irrelevant to --

THE COURT: It was -- yes.

MR. HOLCOMB: -- what the smuggling offense actually was.

THE COURT: It became clear that that was different.

MR. HOLCOMB: So that was one of the issues that the government asked to be able to clear up, but then, based on the posture of the case, went forward and obtained an indictment.

But that issue is cleared up in the indictment. The indictment clearly addresses which section of the smuggling statute is charged, and so I would suggest that was one area of confusion.

And the other, Your Honor, is the significance that was placed on the term "biological materials." There was a lot of questioning that suggested that biological materials was some statutory or regulatory term that had statutory or regulatory importance to the criminal charge. And the government made clear then and makes clear again now that there -- there's no legal term biological materials that's relevant to the criminal charges here.

Where it comes in is just the factual question of it's alleged that the CBP agricultural specialist asked Ms. Petrova, are you carrying biological materials, and she initially denied it.

THE COURT: Well, isn't that relevant to the false statement charges? But, if I remember correctly, it's an issue as to whether or not they had to be declared, and if the statutory definition applies, then they might not have to have been declared.

MR. HOLCOMB: That's not quite correct, Your Honor, because the declaration requirement applies to all articles is the legal term, and so --

THE COURT: Then we're back to the magnets. Are we back to the magnets?

MR. HOLCOMB: We're back to the magnets.

And so -- so, you know, the requirement to declare what it was she was carrying didn't depend on whether they were

or weren't biological materials.

Your Honor's correct that it is narrowly -- the words biological materials are narrowly relevant to the false statement charge in this indictment because that's the charge that alleges that Ms. Petrova falsely denied carrying biological materials when asked.

But I would just suggest that I think that got too much attention at the probable cause hearing, more attention than its relevance to the criminal charges, and that's another reason why there was some confusion there.

THE COURT: Let me just ask you this -- and I'll let you talk, Mr. Fick, in a moment -- but is there any -- other than the general concerns about privacy and confidentiality of the grand jury, is there anything in particular with respect to charges to the jury that require any extra concern about confidentiality?

MR. HOLCOMB: It's the ordinary concern that requires a particularized need here.

THE COURT: Okay.

MR. HOLCOMB: And so I think the answer is really what is permitted under the prevailing precedent, and even the *Facteau* -- or *Facteau* case of Judge Burroughs that the defense cites did not disregard the requirement for a particularized need, and there is no -- there's no argument made here that's -- that's connected enough to any alleged misinstruction

of the grand jury that amounts to a particularized need here.

THE COURT: Doesn't she say in that case -- maybe I have the wrong case -- but doesn't she say it's no longer an issue because we're now at the end of the criminal proceedings and I would have ruled otherwise if I had dealt with it before the trial?

MR. HOLCOMB: I don't know if --

THE COURT: Do I have the wrong case?

MR. HOLCOMB: I think, you know, there were a couple of reasons why she says she is not granting or not compelling disclosure of those materials, but one of those was that her view, as she spelled out in that case, is not consistent with prevailing First Circuit precedent, and in our brief and the opposition --

THE COURT: You do cite her subsequent case.

MR. HOLCOMB: I do cite her subsequent case, and, not only that, it's on page 17, Your Honor, but I cite two or three other cases within this district noting *Facteau* but continuing to find that a particularized need is required even for just the legal instructions to the grand jury.

THE COURT: Mr. Fick.

MR. FICK: So I think the Court has an ample basis to find particularized need, and I'd rest on the papers for that, and just emphasize that, you know, again, the government is trying to slice and dice and isolate arguments about words to

make them seem less important than they are.

I mean, the definition of biological materials, whether it has a legal definition at the border, is plainly relevant to the false statements charges.

The question of -- you know, there are multiple issues, I think, underlying the smuggling charge, but it's really not just about the, sort of, subsections. A big question there is, like, what is merchandise, and how is that defined -- how is that defined to the grand jury in terms of, you know, what they were told about that charge.

And so -- look, I think there's -- there's ample reason here to -- for the Court to order in its discretion release of the grand jury instructions especially where, I mean, the government's even given us Mr. Trim's testimony, I think, because even they would concede there's stuff in there that's exculpatory and so I commend them for that, but, you know, the, kind of, ordinary secrecy concerns here are really absent especially as to the instructions.

MR. HOLCOMB: Your Honor, I think just the indictment itself makes clear that there's no real dispute over any of the -- Mr. Fick just mentioned the definition of merchandise. It's on page 4 in Count 3 of the indictment.

It charges her with fraudulently and knowingly importing and bringing into the United States merchandise defined at Title 19, U.S. Code 1401(c) as goods, wares, and

chattel of every description. So there -- there's no -- if that's the -- what the question is, the indictment answers it.

MR. FICK: I mean, I don't think -- I don't know if the -- if the grand jury was just told goods were goods and chattels in every description, that's interesting.

I mean, I think that in itself doesn't really answer the question. I mean, it's a definition using words that also have legal meaning and definition and may, sort of, belie the underlying, sort of, commercial connotation of merchandise as a matter of plain language, and just knowing what the grand jury was charged here is important.

THE COURT: I will take this under advisement as well.

MR. FICK: Thank you, Your Honor.

THE COURT: As for the sufficiency of the responses to the other request, Mr. Holcomb, do you want to address that? Do you want the opportunity to talk to each other about it?

MR. HOLCOMB: I would just note, Your Honor, that the government's aware of its responsibility to look beyond just what's, like, literally in its own files, and so the government's responses reflect its awareness and compliance with -- with that obligation.

MR. FICK: And I think as to those requests, Your Honor, I don't have a problem with that representation. I think those issues largely have been resolved. If something further comes up, we'll talk about it among ourselves and only,

if necessary, bring it to the Court.

THE COURT: Okay.

MR. HOLCOMB: Your Honor, I believe one of the other agenda items for today was going to be scheduling --

THE COURT: Right.

MR. HOLCOMB: -- dispositive motions. I don't know if Your Honor wants to defer that until after a written decision on this motion.

THE COURT: So why don't I hold this -- why don't I schedule something for -- I think our excludable time runs out today. I think this is the last date that we had --

MR. FICK: We certainly don't object to an exclusion of time. I would just note I am starting a trial on March 2nd for which I am now frantically preparing that's going to be, sort of, all-consuming for a while, so I'm not in a position to do dispositive motions for the immediate future anyway.

THE COURT: Okay. Why don't -- I'm going to set a status conference for -- where are we -- for mid-March, and hopefully by then you will have my decision.

MR. FICK: I just -- if we could wait until the third week of March. Judge Talwani is sitting 9 to 4:30 every day for the first two weeks, so if we're still going -- I think the third week hopefully we're done.

MR. HOLCOMB: And, Your Honor, sorry to complicate things, the third week I'm away, and so I suppose that means

the fourth week.

MR. FICK: That's fine.

THE COURT: So we're on the week of the 23rd, then.

MR. HOLCOMB: Yes.

THE COURT: Okay. So what if we do -- what do I have March 26th, Thursday? The 27th, Friday, the 27th, at 10:30, does that work?

MR. HOLCOMB: Yes.

MR. FICK: Yes, Your Honor.

THE COURT: And I'm just going to set it up as a final status, and we'll see what we cover. We may deal with further discovery issues if they are outstanding at that point, the scope of specific discovery requests, and we'll deal at that point with the scheduling of dispositive motions, all right, or if it's appropriate, we'll send it to the district judge, and you can schedule it there. Okay. Does that work?

MR. FICK: Thank you, Your Honor.

THE COURT: I'm going to exclude the time through then.

MR. FICK: We assent to the exclusion.

THE COURT: Anything further?

MR. HOLCOMB: No. Thank you, Your Honor.

MR. FICK: Thank you, Your Honor.

THE COURT: Thank you, all. This was actually very helpful.

THE CLERK: Court is in recess.

(Recording stopped at 11:30:00 a.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Jennifer Vaillancourt, Registered Professional Reporter and Certified Shorthand Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the audio-recorded proceedings held in the above-entitled matter, to the best of my skill and ability.

Dated this February 14, 2026.

/s/ Jennifer Vaillancourt

Jennifer Vaillancourt, RPR, CSR
Official Court Reporter